# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE CALIFORNIA VALLEY MIWOK
TRIBE, et al.,

      **Plaintiffs,**

      **v.**

SALLY JEWELL, in her official capacity as
Secretary of the United States Department
of the Interior, et al.,

      **Defendants,**

      **and,**

CALIFORNIA VALLEY MIWOK TRIBE

      **Defendant-Intervenor.**

**Civil Action No. 11-CV-00160 (BJR)**

**ORDER REGARDING CROSS MOTIONS
FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

This matter comes before the Court on cross motions for summary judgment. Plaintiffs,

led by Yakima Dixie, claim to be members of the California Valley Miwok Tribe (the "Tribe").

They challenge the August 31, 2011 final decision of Larry Echo Hawk, the Assistant Secretary

of the Bureau of Indian Affairs ("BIA") of the United States Department of Interior ("DOI").

Dkt. No. 49 ("Pls.' Mot."). Federal Defendants Sally Jewell, Secretary of the DOI, Michael

Black, Director of BIA, and Larry Echo Hawk (collectively "the Federal Defendants") oppose

Plaintiffs' motion and request that this Court affirm the August 31, 2011 decision. Dkt. No. 56

("Defs.' Mot."). At the Court's request, Intervenor-Defendant, another group of individuals who

claim to be members of the Tribe and who are led by Silvia Burley, filed a brief in support of the

Federal Defendants' summary judgment motion. Dkt. No. 83.

For the reasons discussed below, this Court concludes that the Assistant Secretary erred when he assumed that the Tribe's membership is limited to five individuals and further assumed that the Tribe is governed by a duly constituted tribal council, thereby ignoring multiple administrative and court decisions that express concern about the nature of the Tribe's governance. Therefore, the Court will grant Plaintiffs' motion for summary judgment in so far as it seeks remand of the August 2011 Decision and deny the Federal Defendants' cross motion for summary judgment.[1]

## II.    FACTUAL BACKGROUND

In 1906, Congress authorized the BIA to purchase land for use by Indians in California who lived outside reservations or who lived on reservations that did not contain land suitable for cultivation. Act of June 21, 1906, 34 Stat. 325. In 1915, an agent working for the Office of Indian Affairs (now the BIA) was tasked with locating a group of Indians known at the time as the "Sheepranch Indians." AR 000001. In reporting back to the Office of Indian Affairs, the agent noted that while the Sheepranch Indians had once been part of "a large band of Indians," the band had dwindled down to "13 in number… living in and near the old decaying mining town known and designated on the map as 'Sheepranch.'" *Id.*[2] In 1916, the BIA acquired approximately 0.93 acres in Calaveras County, California for the benefit of these Indians. AR 000006. The land became known as the "Sheep Ranch Rancheria" and was held in trust for the Indians by the Federal government. AR 001687.

---

[1]    In light of this ruling, Plaintiffs' Motion to Supplement the Administrative Record [Dkt. No. 51] is stricken from the record as moot.

[2]    The agent listed the following individuals on the census for the "Sheepranch Indians": Peter and Annize Hodge and their four children, Malida, Lena, Tom, and Andy; Jeff and Betsey Davis; Mrs. Limpey; John and Pinkey Tecumchey; and Mamy Duncan (although the agent claimed that he located 13 Indians, the census only lists 12 individuals). AR 000002. The census also noted that "[t]o some extent the Indians of Sheepranch, Murphys, Six-Mile, Avery and Angles are interchangeable in their relations." *Id.*

In 1934, Congress passed the Indian Reorganization Act ("IRA"), which, among other things, required the BIA to hold elections through which the adult Indians of a reservation decided whether to accept or reject the applicability of certain provisions of the IRA to their reservation, including provisions authorizing tribes to organize and adopt a constitution under the IRA. 25 U.S.C. §§ 476 and 478. In 1935, the sole resident of the Sheep Ranch Rancheria was Jeff Davis. AR 001687. He voted in favor of the IRA; however, the tribe was never organized pursuant to the IRA at that time. *Id*.

In 1966, during a period in which the Federal government sought to terminate the Federal trust relationship with various Indian tribes, the BIA reached out to the Sheep Ranch Rancheria in order to distribute the assets of the Rancheria to its members as a prelude to termination of the trust relationship. AR 001687. The BIA discovered that the only home on the Rancheria that remained occupied was that of Mabel Hodge Dixie, presumably the granddaughter of Peter and Annize Hodge, who were identified in the 1915 census of the Sheepranch Indians. *Id*. According to Mabel, she had lived on the Rancheria for at least thirty years by 1966. AR 000039. The BIA determined that Mabel was the only Indian entitled to receive the assets of the Rancheria, and she voted to accept the distribution plan and was issued a deed to the land. AR 000048-51, 001687-88. However, the BIA failed to take the steps necessary to complete the termination of Sheep Ranch Rancheria. AR 001573.[3]

---

[3]    Because the BIA did not complete the termination of the Rancheria, it is considered an "unterminated" tribe. AR 000172. This is significant because in those situations where an "unterminated" tribe is pursuing organization under the IRA, the persons possessing the right to organize the tribe are usually specified by a decision of a court, as the majority of "unterminated" tribes regain federal recognition through litigation. *Id*. Usually, the court decision will state that the persons possessing the right to organize the tribe are those persons still living who are listed as distributees or dependent members on the federally approve distribution plan (in this case, Mabel Hodge Dixie). *Id*. In some cases, the courts have extended this right of participation to the lineal descendents of distributees or dependant members, whether living or deceased. *Id*. Here, the usual manner for determining who may organize the tribe does not apply because there is no court decision regarding the same. AR 000173.

Mabel died in 1971. AR 000173. A probate was ordered and the Administrative Law Judge issued an Order of Determination of Heirs on October 1, 1971, reaffirmed by a subsequent Order issued on April 14, 1993. *Id*. The Order listed the following individuals as possessing a certain undivided interest in the Sheep Ranch Rancheria: Merle Butler (Mabel's common law husband) and Mabel's four sons Richard Dixie, Yakima Dixie, Melvin Dixie, and Tommy Dixie. *Id*.; AR 000061.

Sometime in 1994,Yakima Dixie, Mabel's son, wrote a letter to the BIA requesting financial assistance to make repairs to his house on the Rancheria.[4] AR 000082. The letter was written on behalf of Yakima by Raymond Fry, who at the time was a Tribal Operations Officer for the Central California Agency of BIA. AR 001083. In the letter, Yakima represented that he is "the only descendant and recognized tribal member of the Sheep Ranch Rancheria." AR 000082. By 1998, only two of Mabel's five heirs to the Rancheria—Yakima and Melvin—were living. AR 000173.

Also sometime during the 1990s, Silvia Burley contacted the BIA for information related to her Indian heritage. AR 001688. It appears that at one time Burley had been a member of the Jackson Rancheria, a community near the Sheep Ranch Rancheria, but by 1998 was no longer a member. AR 000250, 001096. The reason for her disenrollment is not clear from the record. The BIA determined that Burley might be remotely related to Jeff Davis, the sole eligible voter for the Sheep Ranch Rancheria IRA vote in 1935. AR 001688, n. 7. By 1998,—at the BIA's suggestion—Burley had contacted Yakima. *Id*.

On August 5, 1998, Burley wrote for Yakima's signature, a statement purporting to enroll herself, her two children, Rashel Roznor and Anjelica Paulk, and her granddaughter, Tristian

---

[4]      The date of the letter is illegible except for "94" so this Court presumes, along with the parties, that the letter was written sometime in 1994.

Wallace, into the Tribe. AR 000110. The statement lists Yakima as "spokesperson/Chairman of the Sheep Rancheria" but does not mention Melvin. *Id*. Nor does it describe what criteria, if any, Yakima used to determine whether Burley and her daughters/granddaughter were eligible for tribal membership. *Id*.

On September 24, 1998, Mr. Fry and Brian Golding, Sr., (also a Tribal Operations Specialist with the BIA), met with Yakima and Silvia. The BIA claims that the purpose of the meeting was to "discuss the process of formally organizing the Tribe." AR 000172. However, Yakima claims that he met with Mr. Fry and Mr. Golding, in order to get BIA to help Burley and her family. AR 000120-121; *see also* AR 000250 (stating that Yakima's intent in enrolling the Burley family in the Tribe was only to grant such membership rights necessary to qualify the family for services offered by BIA to members of federally recognized tribes).

The BIA followed up the meeting with a letter in which it "summarized" the issues discussed during the September 24 meeting. AR 000172-176. Relevant to this lawsuit, BIA made the following statements: (1) the Tribe is "held to the Order of the [probate] Administrative Law Judge" for "purposes of determining the initial membership of the Tribe"; (2) Yakima and Melvin, as the only remaining heirs, "are those persons possessing the right to initially organize the Tribe"; (3) because Yakima "accepted Silvia Burley, Rashel Raznor, Anjelica Paulk, and Tristian Wallace as enrolled members of the Tribe," these individuals, "provided that they are at least eighteen years of age," also "possess the right to participate in the initial organization of the Tribe"; (4) Yakima and Burley were to "consider what enrollment criteria should be applied to further prospective members"; and (5) the BIA recommended, "given the size of the Tribe," that

the Tribe "operate as a General Council, which could elect or appoint a chairperson and conduct business."[5] AR 001689.

To that end, the BIA drafted Resolution #GC-98-01, which Yakima and Burley executed on November 5, 1998 (hereinafter, the "November 1998 Resolution").[6] AR 000177-179. The November 1998 Resolution states that the "membership of the Tribe currently consists of at least the following individuals: Dixie, Burley, Rashel, Anjelica, and Tristian; this membership may change in the future consistent with the Tribe's ratified constitution and any duly enacted Tribal membership statutes." *Id*. It further states that Yakima, Burley, and Rashel, "as a majority of the adult members of the Tribe, hereby establish a General Council to serve as the governing body of the Tribe." *Id*.

The next correspondence that the BIA received from the Tribe is a letter submitted by Burley dated April 20, 1999. AR 001573. The letter is titled "Formal notice of resignation" and states that Yakima "resign[ed] as Chairperson of the Sheep Ranch Tribe." AR 000180. Yakima claims that Burley forged his signature on the April 20, 1999 letter. AR 001573. The very next day, on April 21, the BIA received a letter from Yakima in which he states "I cannot and will not resign as chairman of the Sheep Ranch Indian Rancheria." AR 000182. However, the letter further states that Yakima "give[s] [Burley] the right to act as a delegate to represent the Sheepranch Indian Rancheria." *Id*.

On July 20, 1999, BIA and the Tribe entered into a "self-determination contract" that provided annual funding for the development and organization of the Tribe for the benefit of future tribal members, and on September 30, 1999, the Tribe became a "contracting Tribe"

---

[5]    The Superintendent offered a $50,000 ISDA grant available for improving tribal governments, and provided a draft resolution for the Tribe to use in requesting the grant. AR 001689.
[6]    Rashel Reznor did not sign the Resolution. AR 000179. In addition, the Resolution acknowledges that Melvin Dixie is a surviving heir to the Rancheria, but his whereabouts are "unknown." AR 000177.

pursuant to the Indian Self Determination Act, PL 93-638. AR 001453. The parties refer to this annually renewing contract as the Tribe's "P.L. 638 Contract." *Id.*

Shortly thereafter, the leadership dispute that had been brewing between Yakima and Burley came to a head. Over the course of the next couple of years, both Yakima and Burley laid claim to the role of "Chairperson" of the Tribe and attempted to organize the Tribe pursuant to the IRA by submitting multiple competing constitutions that purportedly had been adopted by the tribal membership. For instance, on May 14, 1999, the BIA received a letter that stated that the Tribe's General Council had held an election on May 8, 1999, and as a result of that election, Burley was now the Chairperson of the Tribe, Yakima, the Vice-Chairperson, and Rashel, the Secretary/Treasurer. AR 000236. However, on October 10, 1999, BIA received a letter from Yakima in which he raised concern about the leadership dispute within the Tribe and questioned whether he can "exclude" Burley and her family members from the Tribe. AR 000205. Thereafter, on December 26, 1999, Yakima provided the BIA with a tribal constitution, purportedly adopted by the Tribe on December 11, 1999. AR 001690, 000231. He again alleged "fraud or misconduct relative to the change in Tribal leadership during April and May 1999" and maintained that he is the rightful Chairperson of the Tribe. *Id.*

On February 4, 2000, the BIA wrote a letter to Yakima in response to the concerns he raised regarding the leadership dispute within the Tribe. AR 000234-239. In the letter, the BIA states the following: (1) a General Council was elected by a "majority of the adult members of the Tribe" on November 5, 1998;[7] (2) Burley is the "person presently recognized by the Agency as the Chairperson of the Tribe"; (3) "the appointment of Tribal leadership and the conduct of Tribal elections are internal matters" to be resolved by the Tribe; and (4) in the event of an

---

[7] The BIA states that the November 1998 Resolution was approved by "a majority of the adult members of the Tribe" even though only two adult members signed the Resolution—Yakima and Silvia. AR 000236. Melvin and Rashel did not sign the Resolution. *Id.*

internal leadership dispute, it is the Agency's policy "to continue to recognize[] the Tribal government as constituted prior to the [contested] appointment or election" until such time that the dispute is resolved by the Tribe. AR 000236-237.

However, the BIA further noted that "a continuing dispute regarding the composition of the governing body of the Tribe raises concerns that a duly constituted government is lacking." AR 000237. Therefore, the BIA advised "the Tribe to resolve the dispute internally within a reasonable amount of time … failure to do so may result in sanctions taken against the Tribe, up to and including the suspension of the government-to-government relationship between the Tribe and the United States."[8,9] *Id.*

The BIA followed up the February 4 letter to Yakima with a letter to Burley dated March 7, 2000. AR 000249-254. In it the BIA stated the following: (1) it believes that the appropriate form of government for the Tribe is the General Council; (2) the General Council is comprised of Burley, Rashel, and Yakima; (3) membership and leadership dispute are internal matters to be resolved by the Tribe; and (4) while leadership and membership issues of the Tribe are internal matters to be resolved by the Tribe, "if in time [the] dispute regarding the composition of the governing body of the Tribe continues without resolution, the government-to-government relationship between the Tribe and the United States may be compromised." The BIA again advised that "the Tribe [ ] resolve the dispute internally within a reasonable period of time." AR

---

[8]     The BIA also acknowledged in the same letter that it met with Melvin Dixie on January 13, 2000, and that Melvin expressed an interest in participating in the organization of the Tribe. AR 000238. "Since Melvin Dixie is the only remaining heir, other than [Yakima], identified in the Order of Determination of Heirs, he is entitled to participate in the organization of the Tribe." *Id.*

[9]     On July 18, 2001, Yakima filed a lawsuit against Burley in the United States District Court for the Eastern District of California challenging her purported leadership of the Tribe. AR 000611. On January 24, 2002, the district court dismissed Yakima's lawsuit without prejudice and with leave to amend, for failure to exhaust his administrative remedies. AR 000611. The court determined that Yakima should have appealed the BIA's February 4, 2000 decision in which it recognized Burley as the Chairperson of the Tribe. AR 000611. Thereafter, Yakima filed an appeal of the February 4, 2000 decision with the BIA in June 2003. *Id.* In it, he "challenged the [BIA's] recognition of [] Burley as [the] tribal Chairman and sought to 'nullify' her admission, and the admission of her daughter [sic] and granddaughters [sic] into [his] Tribe." AR 000610.

000253. The BIA also informed Burley that "failure to [resolve the dispute within a reasonable period of time] may result in sanctions against the Tribe, up to and including the suspension of the government-to-government [relationship]." *Id.*[10]

The leadership and membership dispute between Yakima and Burley continued. Then, on February 11, 2004, Burley submitted to the BIA what she alleged was the Tribe's newly adopted constitution—not for the BIA's review—but only for the BIA's records. AR 001095. The BIA interpreted this as Burley's "attempt to demonstrate that [the Tribe] is an 'organized' tribe" under the newly enacted Section 476(h) of the IRA, which allows that "each Indian tribe shall retain inherent sovereign power to adopt governing documents under procedures other than those specified in this section." *Id.*; 25 U.S.C. § 476(h). On March 26, 2004, the BIA notified Burley that it rejected her attempt to "organize" under the IRA pursuant to Section 476(h) (hereinafter, the "March 2004 Decision"). *Id.* In reaching this decision, the BIA emphasized that when a tribe seeks to organize under the IRA, the BIA has a duty "to determine that the organizational efforts reflect the involvement of the whole tribal community." AR 001095. The BIA noted that it did not appear that Burley had made any effort to include the whole tribal community; rather, it appeared that Burley only included herself and her daughters in the process. AR 001096.[11]

Thereafter, the BIA "acknowledge[d] [] Burley as the authorized representative of the [Tribe] with whom government-to-government business is conducted. However, the BIA [did] not view the Tribe to be an organized tribe and, therefore, decline[d] to recognize [] Burley as a

---

[10]     Thereafter, the BIA continued to recognize the General Council as the governing body of the Tribe and Burley as its Chairperson by renewing the Tribe's P.L. 638 Contract annually until 2005. AR 002691. However, as discussed *infra*, in 2005, the Superintendent returned without action proposals from Burley to renew the Tribe's P.L. 98-638 Contract, after concluding that Burley had not shown that the Tribe had authorized her to submit the contract proposal. AR 001692. Burley unsuccessfully challenged the BIA's decisions in federal court in the Eastern District of California. *See California Valley Miwok Tribe v. Kempthorne*, No. Civ. 8-3164 (E.D. Cal. Feb. 23, 2009), *appeal docketed*, No. 09-15466 (9th Cir. March 12, 2009); AR 001692.
[11]     The BIA advised Burley of her right to appeal the letter to the Regional Director. AR 001693. No appeal was filed. *Id.*

'tribal chairperson' in the traditional sense as one who exercises authority over an organized Indian tribe." AR 000507.

In a letter dated February 11, 2005 (hereinafter, the "February 2005 Decision"), the BIA notified Yakima that his appeal from June 2003[12] had been "rendered moot" by the March 2004 Decision. *Id.* In the February 2005 Decision, the BIA reiterated that it did not recognize Burley as the tribal Chairperson, but rather, a "person of authority" within the Tribe." *Id.* It further stated that "[u]ntil such time as the Tribe has organized, the Federal government can recognize no one, including [Yakima], as the tribal Chairman." *Id.* The BIA concluded by stating that it "does not recognize any tribal government" for the Tribe "[i]n light of the BIA's [March 2004 Decision] that the Tribe is not an organized tribe." AR 000611. This is the first time since November 5, 1998 (when the BIA first acknowledged the Tribe's General Council) that the BIA claimed that it did not recognize a duly constituted government for the Tribe.

On July 19, 2005, the BIA, acting on the February 2005 Decision, suspended the Tribe's P.L. 638 Contract. *California Valley Miwok Tribe v. United States*, 424 F. Supp. 2d 197, 201 (D.D.C. 2006) ("*CVMT I*"). Further, on August 4, 2005, the California Gambling Control Commission notified the Tribe that it would withhold distributions from the California Revenue Sharing Trust Fund until the tribal leadership was established. AR 001217-18. On October 26, 2005, the BIA returned a tribal resolution to Burley without having taken the action requested in the resolution, asserting that there was no "government-to-government" relationship with the Tribe. *CVMT I* at 201.

On April 12, 2005, Burley, allegedly on behalf of the Tribe, filed suit in federal court in the District of Columbia, claiming that the BIA was interfering in the Tribe's internal affairs

---

[12] This is the appeal that Yakima filed after the United States District Court for the Eastern District of California dismissed his lawsuit without prejudice because he failed to exhaust his administrative remedies by appealing the BIA's February 4, 2000 decision to recognize Burley as the Tribe's Chairperson. *See*, *infra*, at n. 9.

based on the BIA's refusal to recognize the Tribe as organized under the IRA. *CVMT I*, 424 F. Supp. 2d at 197. The BIA countered that while Section 476(h) of the IRA gives tribes more procedural flexibility in organizing under the IRA, it does not relieve the BIA of its duty to ensure that the interests of all tribal members are protected during organization and that tribal governing documents reflect the will of a majority of the tribe's members. *Id*. BIA thus defended its refusal to recognize the Tribe as an organized tribe on the ground that the Tribe had failed to take necessary steps to protect the interests of its potential members. *Id*. The district court agreed with BIA and dismissed the complaint for failure to state a claim. *Id*. at 203.

Burley appealed to the D.C. Circuit, which affirmed the district court's decision. *California Valley Miwok Tribe v. United States*, 515 F.3d 1262 (D.C. Cir. 2008) ("*CVMT II*"). The Circuit Court noted that "[a]s Congress has made clear, tribal organization under the [IRA] must reflect majority value" and Burley's "antimajoritarian gambit deserves no stamp of approval from the Secretary." *Id*. at 1267-68.

Meanwhile, the BIA continued to encourage both Yakima and Burley to "organize a formal governmental structure that is representative of all Miwok Indians who can establish a basis for their interest in the Tribe and is acceptable to the clear majority of those Indians." AR 001261. To that end, officials with the BIA met with Yakima and Burley "to offer assistance in [their] organizational efforts for the Tribe." *Id*. However, by November 2006, the BIA concluded that "the ongoing leadership dispute [was] at an impasse and the likelihood of th[e] impasse changing soon [is] remote." *Id*.

Accordingly, the BIA, in a November 6, 2006 decision (hereinafter, the "November 2006 Decision"), resolved to "publish a notice of a general council meeting of the Tribe to be sponsored by the BIA in the newspapers within the Miwok region." *Id*. The purpose of the notice

was to "initiate the reorganization process" by inviting "the members of the Tribe and potential members to the meeting" to discuss "the issues and needs confronting the Tribe." *Id*. The BIA invited both Yakima and Burley to participate in the meeting, but noted that the meeting would be held even if one or both of them declined to participate. AR 001262.

Burley appealed the November 2006 Decision to the Regional Director of the BIA. AR 001494. On April 2, 2007, the Regional Director affirmed the November 2006 Decision (hereinafter, the "April 2007 Decision"). AR 001497. The April 2007 Decision noted that the purpose of calling the general council meeting was to identify the "putative" group of individuals who believe they have the right to participate in the organization of the Tribe, and "until the Tribe has identified the 'putative' group, the Tribe will not have a solid foundation upon which to build a stable government." AR 001498.

Burley appealed the April 2007 Decision to the Interior Board of Indian Appeals ("IBIA"). AR 001502. The IBIA affirmed, in part, the April 2007 Decision on January 28, 2010. AR 001684-001705. However, the IBIA also determined that the April 2007 Decision involved an enrollment dispute, and therefore, referred that portion of the April 2007 Decision to the Assistant Secretary of the BIA for review because the IBIA does not have jurisdiction to review enrollment disputes. *Id*.

Sometime in March 2010, after the IBIA referred the matter to the Assistant Secretary but before he issued his decision, Wilson Pipestem, a lobbyist based out of Washington, D.C. and acting on behalf of Burley, met with Tracie Stevens, the Senior Advisor to the Assistant Secretary; Jerry Gidner, Director of the BIA; and Mike Smith, Deputy Director of the BIA's Field Operations, to discuss the IBIA referral. AR 001997. Pipestem followed up the meeting with a letter dated March 24, 2010 in which he argued that the Tribe consists of five members

(Yakima, Burley, Burley's two daughters and Burley's granddaughter) and is governed by the General Council that the Tribe adopted on November 5, 1998. AR 001997 at pp. 1-4.

Without notifying Yakima of the Department's meeting with Pipestem, nor providing Yakima with an opportunity to meet with the Assistant Secretary or brief his side of the issues, the Assistant Secretary issued his decision on December 22, 2010 (hereinafter, the "December 2010 Decision"). AR 001798-001803. In it, the Assistant Secretary "determined that there was 'no need for the BIA to continue its previous efforts to organize the Tribe's government, because it is organized as a General Council, pursuant to the [November 1998 Resolution] it adopted at the suggestion of the BIA.'" AR 002049. The Assistant Secretary also determined that there was "no need for the BIA to continue its previous efforts to ensure that the Tribe confers tribal citizenship upon other individual Miwok Indians in the surrounding area." *Id*.

Yakima objected to the fact that he was not given an opportunity to brief the issues before the Assistant Secretary issued the December 2010 Decision. *Id*. As a result, the Assistant Secretary withdrew the Decision and requested briefing from all of the parties. *Id*.

On August 31, 2011, the Assistant Secretary issued his revised decision (hereinafter, the "August 2011 Decision"). AR 002049-2056. The August 2011 Decision reached the following conclusions: (1) the Tribe is a federally recognized tribe; (2) the BIA cannot force the Tribe to organize under the IRA and will cease all efforts to do so absent a request from the Tribe; (3) the BIA cannot compel the Tribe to expand its membership and will cease all efforts to do so absent a request from the Tribe; (4) as of the date of the Decision, the Tribe's entire citizenship consists solely of Yakima, Burley, Burley's two daughters, and Burley's granddaughter; and (5) the November 1998 Resolution established a General Council comprised of all of the adult citizens of the Tribe, with whom BIA may conduct government-to-government relations. AR 002049-

2050, 002056. The Assistant Secretary acknowledged that the August 2011 Decision "mark[ed] a 180-degree change of course from positions defended by [BIA] in administrative and judicial proceedings over the past seven years." AR 002050. Therefore, the Assistant Secretary stayed implementation of the August 2011 Decision pending resolution of the present litigation. AR 002056.

## III. STANDARD OF REVIEW

The Administrative Procedure Act ("APA") empowers this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although the judiciary bears the responsibility under the APA to set aside agency decisions that meet this description, *see MD Pharmaceutical, Inc. v. Drug Enforcement Admin*., 133 F.3d 8, 16 (D.C. Cir. 1998), "[t]he scope of review under the 'arbitrary and capricious standard' is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Nonetheless, this Circuit has held that "where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, we must undo its action." *Petroleum Communications, Inc. v. F.C.C*., 22 F.3d 1164, 1172 (D.C. Cir. 1994) (citing *American Tel. & Tel. Co. v. F.C.C*., 974 F.2d 1351 (D.C. Cir. 1992)). So long as there are no genuine issues of material fact in dispute, a party is entitled to summary judgment if it is entitled to judgment as a matter of law. *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

## IV. DISCUSSION

As discussed above, the August 2011 Decision reached the following conclusions: (1) the Tribe is a federally recognized tribe; (2) the BIA cannot compel the Tribe to organize under the

IRA and will cease all efforts to do so absent a request from the Tribe; (3) the BIA cannot compel the Tribe to expand its membership and will cease all efforts to do so absent a request from the Tribe; (4) as of the date of the Decision, the Tribe's entire citizenship consisted of Yakima, Burley, Burley's two daughters, and Burley's granddaughter; and (5) the November 1998 Resolution established a General Council comprised of all of the adult citizens of the Tribe, with whom BIA may conduct government-to-government relations.

For the reasons discussed below, the Court finds that the Assistant Secretary was remiss in assuming that the Tribe's membership consisted of only those five individuals and that the General Council is a duly constituted government. Because the Court reaches this conclusion, it is not necessary for the Court to address the remaining three findings in the August 2011 Decision.[13]

### A.      Governing Principles of Federal Indian Law

In determining whether the Assistant Secretary's findings in the August 2011 Decision are arbitrary, capricious, or otherwise not in accordance with the law, this Court recognizes several overarching principles that govern federal Indian law. First, since at least 1831, Congress and the Supreme Court have acknowledged the existence of a trust relationship between the United States and Indian tribes. *Cherokee Nation v. Georgia*, 5 U.S. 1, 17 (1831). Indeed, the Supreme Court's decisions, and nearly every piece of legislation dealing with Indian tribes over the past century, have repeatedly reaffirmed that the federal government has a "distinctive obligation of trust" in its dealings with Indians. *United States v. Jicarilla Apache Nation*, __ U.S. __, 131 S. Ct. 2313, 2334 (2011) (dissent, Justice Sotomayor) (quoting *Seminole Nation v.*

---

[13]      Although the Court notes that none of the parties dispute the Assistant Secretary's conclusion that the Tribe is a federally recognized tribe.

*United States*, 316 U.S. 286, 296 (1942) and F. Cohen, Handbook of Federal Indian Law §

5.04[4][a], pp. 420-421 (2005 ed.)).

Second, Congress has delegated to the Secretary broad power to carry out the federal

government's unique responsibilities with respect to Indians. *See*, *Udall v. Littell*, 366 F.2d 668,

672 (D.C. Cir. 1966); *CVMT II*, 515 F.3d 1267 (noting that the Secretary "has the power to

manage *all* Indian affairs, and *all* matters *arising out of Indian relations*.") (emphasis in original)

(citations omitted). And third, every Indian tribe is "capable of managing its own affairs and

governing itself." *CVMT II*, 515 F.3d at 1263 (quoting *Cherokee Nation,* 5 U.S. at 16). This

means that although tribes do not possess the "full attributes of sovereignty, they remain a

separate people, with the power of regulating their internal and social relations." *Santa Clara*

*Pueblo v. Martinez*, 436 U.S. 49, 55 (1978) (citations omitted).

In light of these governing principles, the D.C. Circuit has held—and reaffirmed in this

very case—that the Secretary has a duty "to promote a tribe's political integrity." *CVMT II*, 515

F.3d at 1267 ("A cornerstone of this [trust] obligation is to promote a tribe's political integrity,

which includes ensuring that the will of the tribal members is not thwarted by rogue leaders

when it comes to decisions affecting federal benefits."). Courts in this Circuit have interpreted

this duty to mean that when the federal government engages in government-to-government

relations with a tribe, it must ensure that it is dealing with a duly constituted government that

represents the tribe as a whole. *Morris v. Watt*, 640 F.2d 404, 415 (D.C. Cir. 1981) (noting that

tribal governments must "fully and fairly involve the tribal members"); *CVMT II*, 515 F.3d at

1267-68 (rejecting Burley's earlier attempt to force the Secretary to recognize the Tribe as

organized under the IRA as an "antimajoritarian gambit [that] deserves no stamp of approval

from the Secretary"); *CVMT I*, 424, F. Supp. 2d 197, 2011 (the Secretary must "ensure that [she]

deals only with a tribal government that actually represents the members of the tribe); *Seminole Nation v. Norton*, 223 F. Supp. 2d 122, 140 (D.D.C. 2002) (noting that the Secretary "has the responsibility to ensure that [a tribe's] representatives, with whom [she] must conduct government-to-government relations, are valid representatives of the [tribe] as a whole"); *Ransom v. Babbitt*, 69 F. Supp. 2d 141, 153 (D.D.C. 1999) (the Secretary was "derelict in [her] responsibility to ensure that the Tribe make its own determination about its government consistent with the will of the Tribe"). With these principles in mind, the Court will now turn to the August 2011 Decision.

**B.      It Was Unreasonable for the Assistant Secretary to Assume that the Tribe's Membership is Limited to Five Individuals**

The August 2011 Decision declares: "the factual record is clear: there are only five citizens of [the Tribe]… the citizenship of the [Tribe] consists solely of Yakima Dixie, Silvia Burley, Rashel Reznor, Anjelica Paulk, and Tristian Wallace." AR 002049 and AR 002055. In reaching this conclusion, the Assistant Secretary assumes, without addressing, the validity of this statement and finds that "prior Department officials misapprehended their responsibility when they: (1) took their focus off the fact that the [Tribe] was comprised a [*sic*] five individuals, and (2) mistakenly viewed the Federal government as having particular duties relating to individuals who were not citizens of the [T]ribe." AR 002053. The Assistant Secretary acknowledges that his August 2011 Decision "mark[s] a 180-degree change of course from positions defended by this Department in administrative and judicial proceedings over the past seven years." *Id*. However, he argues that the course change is necessary and "driven by a straightforward correction in the Department's understanding of the [Tribe's] citizenship."*Id*.

In urging this Court to affirm the August 2011 Decision, the Federal Defendants argue that the Decision "merely reaffirms the state of affairs that has existed since 1998, which

includes Mr. Dixie's unequivocal adoption of the Burley family … [and] marks the BIA's decision to defer, once again, to these individuals to develop membership criteria." Defs.' Mot. at 21. The Federal Defendants argue that the BIA has "full authority to reconsider 'the wisdom of [its] polic[ies] on a continuing basis'" and, under the APA, this Court must uphold the revised policy so long as the agency has provided a "reasoned explanation" for the change. Defs.' Mot. at 16-17 (citing *NCTA v. Brand X Internet Servs.*, 545 U.S. 976, 981 (2005) and *Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1 (D.C. Cir. 2009)).

This Court finds that the Assistant Secretary's conclusion that the citizenship of the Tribe consists solely of Yakima, Burley, Burley's two daughters, and Burley's granddaughter is unreasonable in light of the administrative record in this case. The Assistant Secretary rests his conclusion on principles of tribal sovereignty, but ignores—entirely—that the record is replete with evidence that the Tribe's membership is potentially significantly larger than just these five individuals. For instance, from at least as early as 1997, the BIA recognized that the Tribe consisted of a "loosely knit community of Indians in Calaveras County," AR 000507, and at various times over the last twelve years, the BIA claimed that the Tribe consisted of at least 250 individuals. *See*, *e.g.*, AR 000510, AR 000827. The BIA received genealogies from at least 242 individuals in response to the notice it placed in the newspapers in 2007. AR 002139-340. Even Burley at one time represented to a federal district court that the Tribe consists of at least 250 individuals. *See* Complaint for Injunctive and Declaratory Relief at 1, *California Valley Miwok Tribe v. United States*, No. 02-0912 (E.D. Cal. Apr. 29, 2002). Indeed, the D.C. Circuit took judicial notice that the potential membership of the Tribe consisted of 250 individuals. *CVMT II*,

515 F.3d 1265. The August 2011 Decision makes no effort to address any of this evidence in the record; instead, it simply declares that there are only five citizens of the Tribe.[14]

What is more, even if this Court were to accept the Federal Defendants' newly adopted view that the Tribe's membership was limited to only Yakima in 1998 (and the Burleys after Yakima enrolled them), the August 2011 Decision does not explain why the BIA was not required, pursuant to its "unique trust relationship" with Indian tribes, to ensure that Burley was not taking advantage of Yakima when she sought membership for her family. This Court notes that at the time that Burley first contacted Yakima, he was in jail and suffering from several serious illnesses and other disabilities. *See*, *e.g*., AR 000082, AR 000464. Yet, the BIA acknowledges that it made no effort to determine what criteria Yakima used in determining the Burleys' eligibility. Indeed, Yakima claims that "his intent [in enrolling Burley's family in the Tribe] was only to grant such membership rights necessary to qualify [Burley's family] for services offered by [BIA] to members of federally recognized tribes," thereby suggesting that he enrolled her out of sympathy rather than based on any eligibility criteria. AR 00250, *see also*, AR 000120-121 (same).

Nor does the August 2011 Decision explain why the BIA did not have a duty to protect Yakima's brother Melvin. In September 1998, the BIA acknowledged that Melvin was a member of the Tribe. AR 000172-176. However, Melvin was not consulted by Yakima before Yakima enrolled Burley's family into the Tribe. The August 2011 Decision does not address why the BIA did not have a duty to ensure that Melvin's interests were protected before accepting the

---

[14] The August 2011 Decision draws a distinction between citizens and "potential" citizens of the Tribe, but this argument assumes that the five citizens recognized by the Decision have the exclusive authority to determine citizenship of the Tribe. This circular argument "provides no basis on which [the Court] can conclude that it was the product of reasoned decisionmaking" and therefore violates the APA. *Butte County, Cal. v. Hogen*, 613 F.3d 190, 195 (D.C. Cir. 2010).

Burleys' enrollment into the Tribe (by admitting the four Burley family members, Yakima effectively placed Melvin's tribal rights at the mercy of the Burleys).

Put simply, the Assistant Secretary missed the first step of the analysis. Under these circumstances and in light of this administrative record, rather than simply assume that the Tribe consists of five members, the Assistant Secretary was required to first determine whether the membership had been properly limited to these five individuals. *See*, *e.g*., *Seminole Nation*, 316 U.S. at 296 (noting the "distinctive obligation of trust" the federal government has with respect to Indian tribes); *CVMT II*, 515 F.3d at 1267 (noting that the exercise of the Secretary's authority to manage all Indian affairs is especially vital when the receipt of significant federal benefits is at stake). Accordingly, the Court will remand this issue to the Secretary for reconsideration.

### C. It Was Unreasonable for the Assistant Secretary to Assume that the General Council Represents a Duly Constituted Government of the Tribe

The August 2011 Decision declares: "[t]he [November] 1998 Resolution established a General Council form of government, comprised of all adult citizens of the Tribe, with whom the [BIA] may conduct government-to-government relations. AR 002056. Once again, in reaching this conclusion, the Assistant Secretary simply assumes, without addressing, the validity of the General Council. The Federal Defendants acknowledge that the Assistant Secretary's conclusion represents a "180-degree change of course," but argue that the decision to recognize the General Council as the Tribe's duly constituted government was reasonable and consistent with principles of tribal sovereignty. Defs.' Mot. at 27.

The Court finds that the August 2011 Decision is unreasonable in light of the facts contained in the administrative record. *See F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502 (2009) (noting that an agency must provide "a more detailed justification" for its decision "when its prior policy had engendered serious reliance interests"); *Petroleum Communications*, 22 F.3d

at 1172 ("where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, we must undo its action"). The Assistant Secretary rests his decision to reverse course on the BIA's "clear commitment to protect and honor tribal sovereignty." AR 002050. However, once again, the Assistant Secretary starts his analysis a step too late. Before invoking the principle of tribal self-governance, it was incumbent on him to first determine whether a duly constituted government actually exists. *See*, *e.g*., *Seminole Nation*, 223 F. Supp. 2d at 140 (noting that the Secretary must "ensure that [a tribe's] representatives, with whom [she] must conduct government-to-government relations, are valid representatives of the [tribe] as a whole"); *CVMT I*, 424 F. Supp. 2d 197, 2011 (the Secretary must "ensure that [she] deals only with a tribal government that actually represents the members of the tribe). Indeed, as the Interior Board of Indian Appeals has recognized, when an internal dispute questions the legitimacy of "the initial tribal government," the BIA must ascertain whether the initial government is a duly constituted government:

> This is not an ordinary tribal dispute, arising from an internal dispute in an already existing tribal entity. In such cases [BIA] and this Board must exercise caution to avoid infringing upon tribal sovereignty. Rather, this case concerns, in essence, the creation of a tribal entity from a previously unorganized group. In such a case, BIA and this Board have *a responsibility to ensure that the initial tribal government is organized by individuals who properly have the right to do so*.

*Alan-Wilson v. Bureau of Indian Affairs*, 1997 WL 215308, *10 (IBIA 1997) (citations omitted) (emphasis added); *see also*, *Ransom*, 69 F. Supp. 2d at 155 (chastising the Department for "merely repeating the rhetoric of tribal exhaustion and federal noninterference with tribal affairs," rather than determining the legitimacy of a disputed tribal government).

Here, the August 2011 Decision fails to address *whatsoever* the numerous factual allegations in the administrative record that raise significant doubts about the legitimacy of the

General Council. From as early as April 1999, Yakima contested the validity of the Council. *See* AR 000182 (April 21, 1999 letter from Yakima to the BIA stating that he "cannot and will not resign as chairman of the Sheep Ranch Indian Rancheria"); *see also*, AR 000205 (October 10, 1999 letter from Yakima to BIA raising questions about Burley's authority); AR 001690, 000231 (Yakima notifying the BIA of "fraud and misconduct" with respect to the Tribe's leadership).

In the Federal Defendant's current view of this case, once a Tribe announces a government, the BIA is prohibited from ever questioning the legitimacy of the government no matter how many allegations of fraud are raised. Such a conclusion is not consistent with the "distinctive obligation of trust" the federal government must employ when dealing with Indian tribes, *Seminole Nation*, 316 U.S. at 296, nor is it supported by a reasoned explanation based on the administrative record. *Petroleum Communications*, 22 F.3d at 1172; *CVMT II*, 515 F.3d at 1267 (noting that the exercise of the Secretary's authority to manage all Indian affairs is especially vital when the receipt of significant federal benefits is at stake). Accordingly, the Court will remand this issue to the Secretary for reconsideration.[15]

---

[15] Plaintiffs challenge the August 2011 Decision on several other legal and procedural grounds. However, each of these arguments fails. First, relying on the *CVMT I* and *CVMT II* decisions, Plaintiffs argue that the Secretary is barred by the doctrine of issue preclusion and/or judicial estoppel from recognizing the General Council as the governing body of the Tribe. Pls.' Mot. at 37. This argument is without merit because *CVMT I* and *CVMT II* do not share the same contested issue with this case. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980). The only issue before the courts *CVMT I* and *CVMT II* was whether the Secretary had the authority to refuse to approve a constitution submitted under IRA § 476(h)(1). The courts did not directly address the issues raised here, namely whether the Tribe's membership consists of five members and whether the General Council is the duly constituted government of the Tribe. Indeed, the Federal Defendants acknowledge that if the General Council were to attempt to organize under § 476(h) in a manner that thwarts the participation of the majority of the General Council, the Secretary would be bound by the legal duties outline in *CVMT I* and *CVMT II*. Def.'s Mot. at 30. Next, Plaintiffs argue that the August 2011 Decision is procedurally flawed because it was issued more than "six and a half years after the 2004 Decision was made." Pls.' Mot. at 41. However, this argument ignores the fact that the August 2011 Decision was not a reconsideration of the 2004 Decision but a reconsideration of the December 22, 2010 Decision. Finally, Plaintiffs argue that the Assistant Secretary "lacked jurisdiction" to address any issues related to "the organizational status of the [T]ribe, the recognition of the [General Council], and the participation of the entire Tribal community in the organization process." Pls.' Mot. at 43-44. This argument, too, is without merit. Not only are Plaintiffs' regulatory citations inapposite, their interpretation is directly undermined by the wealth of authority that establishes the Secretary's "plenary administrative authority in discharging the federal government's trust obligations to Indians." *Udall*, 366 F.2d at 672.

## V.     CONCLUSION

For the foregoing reasons, it is HEREBY ORDERED that:

1.  Plaintiffs' Motion for Summary Judgment [Dkt. No. 49] is GRANTED in so far as it
    seeks remand of the August 2011 Decision;

2.  The Federal Defendant's Cross-Motion for Summary Judgment [Dkt. No. 56] is
    DENIED;

3.  This matter is remanded to the Secretary for reconsideration consistent with the terms of
    this order; and

4.  Plaintiffs' Motion to Supplement the Administrative Record [Dkt. No. 51] is STRICKEN
    from the record as MOOT.

Dated this 13th day of December, 2013.

_____
Barbara Jacobs Rothstein
U.S. District Court Judge